Filed 1/8/15  P. v. Hughes CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERALD HUGHES,<br><br>    Defendant and Appellant.<br>_____ | B249932<br><br>(Los Angeles County<br>Super. Ct. No. KA089612) |
| In re GERALD HUGHES,<br><br><br>    on Habeas Corpus. | B258470<br><br>(Los Angeles County<br>Super. Ct. No. KA089612)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

    It is ordered that the unpublished opinion filed December 22, 2014, be modified as follows:

On page 11, the final sentence of the first partial paragraph is modified to read: "Substantial evidence in the record indicates the attorneys decided not to call Luis because he denied being present on the night in question, and it is fair to infer that the confiscated note could have been used to impeach him had he testified at trial."

Appellant's petition for rehearing is denied.

There is no change in the judgment.

---

*EPSTEIN, P. J.     MANELLA, J.     COLLINS, J

Filed 12/22/14 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B249932 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA089612) |
| v. | |
| GERALD HUGHES, | |
| Defendant and Appellant. | |
| In re GERALD HUGHES, | B258470 |
| on Habeas Corpus. | (Los Angeles County Super. Ct. No. KA089612) |

APPEAL and PETITION for writ of habeas corpus from a judgment of the Superior Court of Los Angeles County, Tia Fisher, Judge. Judgment affirmed. Petition denied.

Fay Arfa for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Gerald Hughes appeals from the judgment entered upon his jury conviction of several sex crimes. Defendant contends his conviction is not supported by the evidence; the prosecution withheld exculpatory evidence; the trial court erred in allowing police reports to be read into evidence, as well as in excluding the victim's misdemeanor theft conviction and the perjury charges filed against one of the testifying officers; defense counsel was ineffective for stipulating to the reading of police reports and for failing to investigate and call exculpatory witnesses; the seven-year pre-arrest delay prejudiced defendant; and cumulative error rendered his trial unfair. On defendant's request, we reviewed the sealed transcript of the in camera hearing under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) and determined that no discoverable information was withheld. We affirm the judgment and deny defendant's petition for writ of habeas corpus, which raises the same claims of ineffective assistance of counsel as the appeal.

## FACTUAL AND PROCEDURAL SUMMARY

In 2003, the victim, identified in the record as Jane Doe, was a bartender at JJ's Bar (JJ's) in El Monte. The bar was within walking distance from her home. On February 23, 2003, the victim and the married man she was dating, Jose G., went out drinking and had an argument. Jose G. and the victim gave several different accounts about what bars they went to and where the argument occurred. At about midnight, the victim started walking home from JJ's, in a high crime area known for prostitution activity. Several drivers stopped to offer her a ride, but she declined. She was frightened and called Jose G. from a payphone to come get her, but continued walking after the call was disconnected.

Defendant drove up to the victim and at gunpoint demanded that she get in his car. He directed her to do as she was told and drove her to a grocery store parking lot on Rosemead Boulevard. He then told her to pull down her pants and underwear and unsuccessfully attempted to insert his flaccid penis into her vagina. Frustrated, he demanded oral sex. The victim complied, and afterwards defendant again attempted to

2

penetrate her, but could not. He inserted a vibrator into her vagina and moved it around, then managed to force his now erect penis partway in. The victim could not tell if defendant ejaculated. After he lost his erection, defendant cleaned the victim with napkins he wetted at a water hose. The napkins, which he threw on the ground, were not recovered.

Defendant drove the victim to her home and apologized for what he had done, explaining she was not the person he had been sent to assault that night. He offered her a job transporting money or drugs and wanted to know where he could reach her. The victim agreed to work for him and gave him JJ's telephone number.

Once home, the victim told her uncle she had been robbed because she was ashamed to tell him the truth. But she called Jose G. and told him someone with a gun forced her into a car and abused her. She cried during the phone call. On Jose G.'s advice, the victim called 911 and was taken to a hospital where she was joined by Jose G. Both were interviewed by police. Later that night, the victim was examined by a nurse, who noted abrasions outside and a tear inside her vagina, consistent with penetration by an object. The nurse also noted an unusual gray secretion outside the vagina that could have been caused by a dirty napkin.

In 2010, appellant's DNA was matched to the DNA profile of sperm found on genital and vaginal swabs taken from the victim, but not on an oral swab. Defendant was charged in four counts with kidnapping to commit oral copulation, forcible oral copulation, sexual penetration by a foreign object, and forcible rape. (Pen. Code, §§ 209, subd.(b)(1); 288a, subd. (c)(2); 289, subd.(a)(1); 261, subd. (a)(2).) Firearm use allegations were attached to all counts. (*Id*., § 12022.53, subd. (b).) A prior strike conviction and a prior prison term also were alleged. The jury convicted defendant as charged and found the firearm allegations to be true. Following an evidentiary hearing, the court denied his motion for a new trial. It found the prior conviction and prison term allegations to be true. Defendant received an indeterminate sentence of life in prison and a determinate sentence of 52 years. He filed an appeal and a petition for writ of habeas corpus.

DISCUSSION

I

Defendant contends the evidence does not support his conviction because the victim's version of events was "incredible" and uncorroborated. He claims the "only logical" conclusion is that the victim had consensual sex with him and fabricated the charges to get attention from Jose G., her married boyfriend.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

To be deemed improbable, testimony accepted by the trier of fact must be "'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.) The falsity of such testimony "'"must be apparent without resorting to inferences or deductions.'"" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728.)

Defendant claims the victim gave conflicting versions of events, but he fails to identify any material contradictions in her testimony. The victim's testimony is neither physically improbable nor inherently incredible, and it is corroborated by other evidence. DNA evidence supports her identification of defendant as the perpetrator. Her trial testimony that defendant forced her to enter his car at gunpoint is consistent with her 2003 reports of the incident. ~(RT 777-780, 1405, 1514-1515)~ Although the victim

4

vacillated as to whether defendant penetrated her vagina with his penis and whether he ejaculated, the presence of his sperm on vaginal swabs supports her trial testimony that he did. The victim's testimony that defendant used a vibrator is corroborated by the examining nurse's testimony that the vaginal abrasions were consistent with the use of an object. Defendant claims it is incredible that a rapist would drive his victim home, offer her a job, and take her telephone number, but, as he also notes, the victim told police that by the end of the encounter he again held her at gunpoint.

Defendant asks us to conclude that the victim had consensual sex with him and fabricated the rape story to get Jose G.'s attention; he argues that is the only logical conclusion, based on her decisions to walk at night in an area known for prostitution activity and to call Jose G. rather than 911. Even were that a reasonable conclusion, it is not the only one that can be drawn from the evidence. (*People v. Valencia* (2008) 43 Cal.4th 268, 289–290 [where findings are supported by substantial evidence, a possible contrary finding does not warrant reversal].) Moreover, the conclusion defendant urges would require us to redetermine issues of credibility and draw from the victim's testimony inferences favorable to defendant rather than to the judgment. Doing so would amount to an improper reweighing of the evidence. (See *People v. Ennis*, *supra*, 190 Cal.App.4th at p. 732.)

## II

Defendant contends the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by delaying production of the clothes the victim wore on the night of the assault. Under *Brady*, the prosecution has a duty to disclose to the defense any evidence that is favorable to the accused and material to the issues of guilt or punishment. (*People v. Verdugo* (2010) 50 Cal.4th 263, 279.) "'[E]vidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.]' . . . [Citations.]" (*Ibid.*)

5

Before trial, the El Monte Police Department informed the prosecution that the victim's clothes could not be found; after trial, the clothes were located and turned over for examination and DNA testing. The testing confirmed the presence of defendant's sperm on the victim's pants and underwear. Despite the incriminating DNA evidence found on the clothes, defendant claims they could have been used at trial to impeach the victim. He does not show that the impeachment would have been on material aspects of her testimony rather than on collateral matters, or that it would have had a significant effect on defense counsel's trial strategy.

That the victim wore a top, rather than a shirt as she claimed as trial, or that she wore no bra, contrary to what she told police and the jury, was not material, and impeachment evidence on the subject was presented at trial. The victim herself testified she did not remember what type of shirt she wore. The examining nurse's report listed the victim's clothing as jeans, top and panties, and did not include a bra. The defense pointed out the discrepancy at trial.

Defendant speculates the victim's pants and underwear could not have been pulled down to her knees "easily" while she sat in the car. But the victim did not testify that she did so "easily." Defendant claims the presence of his sperm on the victim's clothes would have impeached her testimony that he did not ejaculate. Evidence was presented at trial that defendant's sperm was inside the victim's vagina even though the victim was unsure if he ejaculated.

The victim's clothing was not material impeachment evidence, and other evidence at trial was available to challenge the minor inconsistencies in the victim's testimony that defendant points out on appeal. No *Brady* violation occurred.

### III

Defendant claims the exclusion of evidence about the victim's 2002 petty theft conviction and the perjury charges against one of the testifying police officers deprived him of his constitutional right to confront and cross-examine witnesses.

Conduct involving moral turpitude is admissible to impeach a witness in a criminal trial, subject to "the trial court's discretion to exclude evidence whose probative

6

value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time. (Evid. Code, § 352.)" (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 (*Wheeler*).) "The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues. . . . [¶] . . . In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value. [Fn. omitted.]" (*Id*. at pp. 296–297.)

Defendant is incorrect that misdemeanor convictions are admissible under *Wheeler*, *supra*, 4 Cal.4th 284. As the court in that case made clear, the conduct underlying the conviction may be admissible, but the conviction itself is inadmissible hearsay. (*Id*. at pp. 292, 297.) Defendant's trial counsel sought to use the underlying facts of the victim's petty theft of merchandise from J.C. Penney. While petty theft is a crime of moral turpitude (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925), it is a not a particularly "forceful indicator of immoral character or dishonesty." (*Wheeler*, at p. 296.) The trial court was concerned that the facts of the offense might be used to smear the victim's character. That was a valid concern. Questioning a rape victim about a minor offense she committed in her early twenties might have been perceived as "unfair and needlessly humiliating." (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1266.) The court did not abuse its discretion in precluding examination of the victim about the petty theft incident.

Defendant also sought to question Officer Marin about dismissed perjury charges that were based on his signing of three blank forms El Monte city employees participating in a carpooling program used to claim he rode with them. Officer Marin's only testimony at trial was that he transported the victim's sexual assault kits, along with other DNA evidence, to the crime lab in 2008. Defendant claims the perjury charge,

7

stemming from Officer Marin's signing of blank forms, was relevant because he had to fill out forms on the DNA evidence he transported. Defendant speculates that the jury could have inferred that he mixed the DNA samples or submitted false forms to implicate defendant. The court did not abuse its discretion in excluding this evidence of a collateral credibility issue about a minor witness. (See *People v. Pearson* (2013) 56 Cal.4th 393, 454–455 [no abuse of discretion in disallowing cross-examination of witness about dismissed charges of fraud on speculative showing of bias].)

The exclusion of evidence of "marginal impeachment value . . . does not contravene a defendant's constitutional rights to confrontation and cross-examination. [Citation.]" (*People v. Pearson*, *supra*, 56 Cal.4th at p. 455.) Defendant was not deprived of these constitutional rights.

IV

Defendant argues the trial court violated his rights of cross-examination, due process and a fair trial by allowing the investigating officers and examining nurse to read their reports into evidence.

The victim was cross-examined extensively about statements she made in 2003, which she either could not recall or denied making. The court and counsel agreed that the victim's statements contained in the police and sexual examiner's reports could be introduced as prior consistent or inconsistent statements, or as past recollection recorded. Based on counsel's stipulation, the court allowed the investigating officers and examining nurse to read their reports to the jury. It is well settled that failure to object to the admission of evidence in the trial court forfeits the issue on review. (Evid. Code, § 353; *People v. Pearson*, *supra*, 56 Cal.4th at pp. 438–439.) Defense counsel's agreement to this procedure precludes defendant's challenge to it.

Defendant argues in the alternative that his trial counsel was ineffective for agreeing to the procedure because the reports slanted the evidence in favor of the prosecution and gave it the imprimatur of truth.

To establish a denial of the right to effective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that there was a

8

reasonable probability of a more favorable result but for the deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691–694.) "Judicial scrutiny of counsel's performance must be highly deferential [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.]" (*Id.* at p. 689.) We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy. [Citation.]'" (*Ibid.*) To prevail on an ineffective assistance of counsel claim, a defendant must affirmatively show "the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.)

During the evidentiary hearing on defendant's motion for new trial, defendant's two trial attorneys testified they agreed to have the reports read into evidence because of their concern that the victim had been on the witness stand for several days and that she had been crying at times. The attorneys wanted to "get her off" the stand, but also wanted to introduce her prior inconsistent statements into evidence since their strategy was to attack the victim's credibility. They made a tactical decision to have the reports read into evidence since the statements in them would "come out on direct or cross-examination anyway. There wasn't anything in there that wouldn't have been brought out." It cannot be said that defense counsel had no rational tactical purpose in stipulating to the reading of the reports. The defense also was allowed to take advantage of this procedure when its private investigator read Jose G.'s 2011 statements, which detailed his relationship with the victim.

Defendant's argument that reading the reports was prejudicial because they endorsed the prosecution's case is exaggerated. The witnesses' prior inconsistent and consistent statements were admissible for purposes of impeachment and rehabilitation under Evidence Code sections 1235 and 1236. The court instructed the jury that the

9

reports themselves were not evidence, but could "facilitate the expeditious and just ascertainment of the truth." We do not read the court's instruction as vouching for the truth of the statements contained in the reports, as defendant insinuates; nor could investigating officer Fraser's statement that his report is "an accurate record" of statements the victim and Jose G. made to him in 2003 be reasonably read as endorsing the truth of those statements. That a statement is accurately recorded does not mean it is true, and to the extent the reports contained prior inconsistent statements, the jury, as the fact finder, was to ascertain the truth.

V

Defendant also argues his trial attorneys were ineffective in failing to investigate and present exculpatory witnesses, specifically his brother and an expert witness.

A. *Defendant's Brother*

In support of defendant's motion for a new trial, Luis Hughes, defendant's brother, claimed to have told defendant's trial counsel he had been with defendant at JJ's and had seen him leave with the victim at about the time of the alleged kidnapping. Defendant's first trial attorney, Mark Shapiro, testified Luis had told him he did not recognize the victim and had no information about the night in question. At some point during trial, Luis told the next defense attorney, Sandra Applebaum, that he and defendant went to bars and defendant "hooked up" with women there. At the same time, a note was found during a patdown of defendant at the county jail. In the note, defendant instructed his brother to say they met a girl at a bar, and she and defendant "took off." On suspicion that defendant was concocting an alibi, his conversation with his wife was recorded. Defendant told his wife the note was incriminating and that she should tell Luis "what to say, what I want him to say in court." Defendant's wife related to his attorneys that the police had confiscated the note, and the attorneys were concerned the note would be used for impeachment. They checked with Luis whether he had been with defendant on the night of the alleged assault, and he again denied it.

Defendant contends Luis should have been called as a witness based either on his claim that he was a percipient witness on the night in question, or on his claim that he and

10

defendant had a custom of going to bars where defendant would pick up consenting women. The trial court credited the attorneys' testimony and questioned the veracity of the proposed alibi. Substantial evidence in the record indicates the attorneys decided not to call Luis because he denied being present on the night in question, and because they were concerned that the confiscated note might be used to impeach his testimony.

## B. Medical Expert

At the evidentiary hearing, counsel Appelbaum testified that the defense had intended to call a licensed physician with expertise in rape cases, who had been expected to testify that the abrasions in the victim's vagina were consistent with a vaginal infection and could not have been caused by a vibrator. On the day of his scheduled testimony, the physician advised counsel he had changed his opinion and would not testify that the injuries were inconsistent with the use of a vibrator. Counsel decided not to call him. In support of his motion for new trial, defendant offered a declaration in which the physician stated he was willing to testify for the defense and did not know why he had not been called at trial. Defendant also offered a declaration by a certified obstetrician, who opined the victim's injuries were consistent with the use of a vibrator or a penis. Defendant did not call either expert witness at the evidentiary hearing, and the court credited defense counsel's testimony.

Substantial evidence supports the court's finding that defense counsel was not ineffective in making tactical decisions not to call defendant's brother or its retained expert witness at trial. Defendant would have us redetermine issues of credibility, contrary to the well established standard of review of factual issues on appeal. (See *People v. Delgado* (1993) 5 Cal.4th 312, 329 [trial court may consider credibility and materiality of evidence offered in support of motion for new trial; appellate court may not interfere with trial court's reasonable determinations].)

## VI

Defendant contends he was prejudiced by the seven-year delay between the alleged 2003 rape and the 2010 charges against him.

11

A trial court's ruling on a motion to dismiss for pre-charging delay is reviewed for abuse of discretion, and its factual findings are reviewed for substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) We consider all evidence that was before the court at the time of its final ruling on the issue. (*Ibid*.) To determine whether pre-charging delay violates due process, the court must balance the reason for the delay against the showing of prejudice. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1255–1256 (*Nelson*).) If a defendant is not prejudiced, there is no need to determine whether the delay was justified. (*Id*. at p. 1255) On the other hand, "[p]urposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id*. at p. 1256.)

In *Nelson*, *supra*, 43 Cal.4th 1242, the defendant demonstrated some prejudice from the 36-year delay before he was charged with a 1979 murder. The prejudice included missing witnesses and photographs, loss of memory and alibi evidence, and lost or destroyed evidence. (*Id*. at pp. 1247, 1251.) Because his claims of prejudice were largely "overstated, speculative, or meritless," the court concluded the prejudice was minimal. (*Id*. at p. 1251.) On the other hand, the delay was purely investigative because the case was not fully solved until DNA evidence was analyzed in 2002. (*Id*. at p. 1256.) The court rejected the claim that the DNA could have been tested earlier, declining to second-guess "how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Ibid*.)

Defendant's showing of prejudice is weak and self-serving. He claims memory loss and loss of material witnesses to confirm his alibi, yet he based his motion for a new trial on his own and his brother's claimed recollection of the events of February 23, 2003. Defendant complains the victim suffered from memory loss because she could not remember certain details at the preliminary hearing; yet, in other portions of his opening

12

brief, he contends she was able to testify fully about the charged crime at trial. Moreover, the existence of contemporaneous police and medical examination reports diminishes any claimed prejudice from memory loss. (See *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 506 [prejudice from fading witness memories due to delay is diminished where contemporaneous police reports exist].) Defendant's loss of evidence is exaggerated as photographs of the victim were available at trial, and her 911 call was included in police reports. As the People point out, it is unclear whether security tapes ever existed, whether telephone records could not be obtained, whether a urine sample was indeed unavailable for testing, or how the change of the neighborhood was relevant. Defendant does not answer these questions in his reply brief.

Even assuming that some actual prejudice existed, here as in *Nelson*, *supra*, 43 Cal.4th 1242, the delay was purely investigatory. The evidence shows there were backlogs in testing DNA evidence, and the sheriff's department had directed police departments not to submit DNA evidence for testing unless a named suspect was in custody. In 2003, no evidence linked defendant to the crime, and the case was closed. A DNA backlog reduction program was implemented in 2009. The El Monte Police Department submitted the victim's sexual assault kit for analysis in late 2008, and the DNA was matched to defendant's 1999 DNA profile in early 2010. Newly obtained swabs from defendant and the victim were matched to the 2003 sexual assault kit in August 2010. Defendant was charged in September 2010.

Balancing the weak showing of prejudice against the strong justification for the delay, we find the trial court did not abuse its discretion in denying defendant's motion to dismiss the case.

VII

Defendant has asked us to review the sealed transcript of the August 2, 2011 in camera *Pitchess* hearing. When a defendant seeks discovery from a police officer's personnel records, the trial court must determine whether potentially responsive documents from the officer's personnel file should be produced to the defendant. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225–1226, 1229 (*Mooc*).) The court must make a

13

record of what documents it examined.  (*Id*. at p. 1229)

The *Pitchess* hearing concerned Officer Marin's truthfulness, which became an issue after the People revealed on the record that perjury charges had been filed against him.  At the time of the hearing, the charges had been dismissed, but the officer was still on administrative leave.  The record adequately describes the documents on which the trial court based its determination, and we conclude that it satisfied the minimum procedural requirements in determining that there was no additional discoverable information.  No abuse of discretion occurred.  (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)

## VIII

Because we have found no errors, defendant's claim of cumulative error also fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639.)


## DISPOSITION

The judgment is affirmed.  The petition for habeas corpus is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EPSTEIN, P. J.

We concur:


MANELLA, J.


COLLINS, J.

14